UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| VICKIE L. AUTMAN ROSS, | ) | CASE NO. 3:16-cv-1209 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

## I.    Introduction

Plaintiff, Vickie Autman Ross, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits and Disability Insurance Benefits under Titles II and XVI of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence does not support the Commissioner's decision and because the ALJ did not correctly apply the applicable regulatory standards, I recommend that the final decision of the Commissioner be VACATED and that the case be REMANDED for further proceedings consistent with this Report and Recommendation.

## II.    Procedural History

At the outset of his decision, the ALJ noted that plaintiff had previously filed disability applications on August 8, 2011. Those applications resulted in unfavorable determinations on January 13, 2012, and plaintiff did not request reconsideration. Plaintiff next filed the

applications which are the subject of this appeal.  Because plaintiff did not  challenge the

previous denials, they became final and cannot be reopened.  Thus, plaintiff cannot be entitled to

benefits for any condition that existed prior to January 14, 2012, the day after the earlier

unfavorable decision.  The ALJ considered evidence related to the previously adjudicated period

only to the extent it reflected on plaintiff's functioning and entitlement to benefits during the

relevant period.  Plaintiff is not challenging the ALJ's treatment of her prior applications or the

evidence predating January 14, 2012.

Plaintiff applied for a period of disability and disability insurance benefits on August 13,

2013.  (Tr. 20)  She also protectively filed an application for supplemental security income on

July 23, 2013.  (Tr. 20)  Plaintiff's applications were denied initially on October 29, 2013 (Tr.

129-144) and after reconsideration on January 9, 2014.  (Tr.146-156)  Ms. Autman Ross

requested an administrative hearing.  (Tr. 157)

Administrative Law Judge ("ALJ") Earl Ashford heard the case on April 6, 2015.  (Tr.

42)  The ALJ issued a decision on April 17, 2015, finding that plaintiff was not disabled.  (Tr.

17-35)  Plaintiff requested a review of the hearing decision on June 9, 2015. (Tr. 14)  The

Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1-6)  On May 19, 2016,

plaintiff filed this action to challenge the Commissioner's final decision in this court. (Doc. 1)

The parties have filed all necessary briefs and record materials to make the matter ripe for this

court's review.

III.    Evidence

A.    Personal, Educational and Vocational Evidence

Ms. Autman Ross was born on December 5, 1961 and was 53 years old at the time of her

hearing. (Tr. 46)  She lived with her husband in Toledo, Ohio.  (Tr. 46)  Ms. Autman Ross did

not complete high school.  (Tr. 47)  She previously worked as a housekeeper and childcare provider. (Tr. 48-49)

### B.    Medical Evidence of Plaintiff's Physical and Mental Impairments[1]

Plaintiff went to South Side Community Health Center, her primary care provider, on January 18, 2013 complaining of anxiety, depression, poor sleep, and decreased energy.  (Tr. 348)  Plaintiff was prescribed paroxetine (Paxil) and Vistaril and was advised about the risks associated with long term use of Ativan.  (Tr. 350)  At a follow-up appointment on May 16, 2013, plaintiff admitted that she had not been taking the prescription of paroxetine due to the cost. (Tr. 343)  Plaintiff continued to report anxiety and depression.  (Tr. 344)  Plaintiff's doctor recommended trying a different pharmacy to see if she could decrease the cost of paroxetine  and continued plaintiff's prescription for Vistaril. (Tr. 345)

On February 26, 2014, plaintiff presented to Harbor Behavioral Health, where she was previously a patient, with complaints of anger, depression and anxiety. (Tr. 413)  Plaintiff reported that she was not currently taking any medication. (Tr. 414)  She reported that her former spouse had been verbally, physically and emotionally abusive and that she had flashbacks to the abuse. (Tr. 414)  She also admitted to recently hitting her husband in anger. (Tr. 414)  Plaintiff reported that she was formerly addicted to cocaine and used marijuana daily. (Tr. 415)  She reported that she was having panic attacks twice daily that made it difficult for her to go out into public or to the store. (Tr. 418)  Plaintiff also reported symptoms of depression beginning after the birth of her first child.  She reported hallucinations that "come and go," including hearing a

---

[1] The record contains medical evidence related to plaintiff's **physical** impairments and functional limitations.  However, plaintiff's arguments only deal with her mental impairments.  In her brief, plaintiff has limited the discussion of her medical history to her mental impairments and they are the only records relevant to this court's decision.  See ECF Doc. 13, Page ID# 674-679.

voice telling her to harm herself and seeing shadows out of the corner of her eye. (Tr. 418) Counselor Lisa Batey, PCC, diagnosed major depressive disorder, recurrent, severe with primary psychotic features and panic disorder with agoraphobia. (Tr. 419)  She assigned a GAF score of 50. (Tr. 419)

At a follow up appointment on March 17, 2014, plaintiff reported suicide ideation with no specific plan.  (Tr. 555)  She complained of continuing panic attacks including three the day before her appointment. (Tr. 555)  Plaintiff reported that she had been sleeping for the last two days and had not wanted to be around anyone. (Tr. 555)  Ms. Batey observed that plaintiff had a depressed mood with a restricted affect. (Tr. 555)

On March 24, 2014, plaintiff met with Dr. Olga Zhalkovska, a psychiatrist also associated with Harbor Behavioral Health. (Tr. 544)  Plaintiff complained of intermittent depression and anxiety for a few years.  (Tr. 544)   She rated her current mood as 1-2/10 and reported poor sleep, low energy, social withdrawal, voices telling her to kill herself, and some suicidal thoughts to shoot herself (but no intent). (Tr. 544)  Plaintiff also reported having panic attacks a few times per week sometimes without reason and sometimes triggered by being in crowded places. (Tr. 544)  Dr. Zhalkovska's notes indicate that plaintiff was being prescribed Celexa and Seroquel. (Tr. 548)

At a medication follow-up appointment with Dr. Zhalkovska on April 7, 2014, plaintiff reported improved sleep.  (Tr. 550)  However, she also reported that her symptoms of depression and anxiety had not improved. (Tr. 550)  She continued to complain of mumbling voices telling her to hurt herself; pervasive sadness and anhedonia; hopelessness and worthlessness; passive suicidal ideation without intent; and significant anxiety with panic attacks and avoidant behavior. (Tr. 550)  Dr. Zhalkovska noted that plaintiff appeared calmer and less tense. (Tr. 550)

### C. Opinion Evidence

#### 1. Psychological Consultative Examiner – Mark D. Hammerly, Ph.D. – October 2013

Dr. Mark D. Hammerly, Ph.D., performed a consultative examination of plaintiff on October 3, 2013. (Tr. 396-404)  At the exam, plaintiff said that she was seeking disability due to her mental state. (Tr. 397)  She complained of poor sleep and anxiety. (Tr. 399-400)  She denied socializing with friends because she would "shut down." (Tr. 397)  Plaintiff reported "hearing voices" and "seeing things," but back-pedaled when asked directly about these comments. (Tr. 401)  Plaintiff stated that she had been fired from her last two housekeeping jobs because she lost her temper and was having hallucinations. (Tr. 398)  Plaintiff reported that she spent most of her day watching television and trying to do some housework. (Tr. 399)  Plaintiff told Dr. Hammerly that she and her husband share all household duties, including dishes, laundry, cooking, housecleaning and grocery shopping. (Tr. 400)  Plaintiff said her husband paid the bills and handled their finances. (Tr. 399)  Plaintiff reported that she had psychiatric treatment a few years earlier but was forced to stop due to lack of medical insurance. (Tr. 399)  Plaintiff had resumed her treatment a couple months before meeting with Dr. Hammerly and reported taking Prozac and Ativan as of the date of the consultative exam. (Tr. 399)

Dr. Hammerly noted that plaintiff did not elaborate on her statements very well and related to him in an agitated, demoralized and tearful manner. (Tr. 398, 400)  Plaintiff's mood was dysphoric and her affect constricted and sometimes tearful. (Tr. 402)  She appeared "rather distraught" and did not always "make much sense." (Tr. 401)  She expressed feelings of hopelessness, guilt, worthlessness, and helplessness. (Tr. 400)  Plaintiff was unable to calculate change, did not get a single correct answer when attempting the Serial Sevens task, and demonstrated an impaired fund of knowledge – "between the low borderline to MR ranges." (Tr.

401) Dr. Hammerly diagnosed mood disorder with psychotic features and assigned a GAF score of 50. (Tr. 402) He found her reliability to be "somewhat questionable." (Id.) He recommended that a payee be assigned to manage any benefits to be awarded. (Tr. 404)

In the functional assessment section of his report, Dr. Hammerly opined that plaintiff would have significant problems responding appropriately to supervision and coworkers in a work setting due to her active psychosis. He believed that her current level of depression and complaints of psychosis would cause some noticeable problems relating to supervisors and coworkers. (Tr. 404) He noted that plaintiff had had some significant trouble relating to him during the interview because she was visibly depressed. (Tr. 404) He felt that she would have a hard time relating to supervisors, coworkers and would have difficulty sustaining employment dealing with the public. (Tr. 404) He also felt that she would not respond appropriately to ordinary workplace pressures or any changes in the workplace due to her psychosis and depression. (Tr. 404)

### 2. Consultative Examiner – William D. Padamadan, MD – October 2013

On October 8, 2013, consultative examiner, William D. Padamadan, MD conducted a manual muscle test on plaintiff. (Tr. 386-389) The results of the test were normal. (Tr. 386) In the remarks section of his report, Dr. Padamadan wrote that plaintiff had back pain with Waddell's sign and rated her pain as "10/10 with a smile on her face." (Tr. 385, 389) He found that she had good range of motion in her shoulders, elbows, wrists and fingers. (Tr. 384) Her upper extremity functions for reaching, handling, fine and gross movements were intact. (Tr. 385) He opined that she was able to carry 10-20 pounds frequently and occasional lifting of more than 20 pounds. (Tr. 385)

### 3. Treating Psychiatrist, Dr. Olga Zhalkovska – April 2014

Dr. Olga Zhalkovska completed questionnaires related to plaintiff's anxiety and depression on April 7, 2014. (Tr. 593) In the form related to plaintiff's anxiety, Dr. Zhalkovska

indicated that plaintiff was exhibiting generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, and apprehensive expectation. (Tr. 593)  She also affirmed that plaintiff was exhibiting a persistent irrational fear of a specific object, activity or situation which resulted in a compelling desire to avoid the dreaded object, activity or situation. (Tr. 593)  She checked "yes" when asked whether plaintiff "experience[d] recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. (Tr. 593)  Dr. Zhalkovska opined that plaintiff had extreme deficiencies of concentration, persistence, or pace that would result in a failure to complete tasks in a timely manner. (Tr. 594)  The form defined "extreme" as "severe impairments of ability to function." (Tr. 594)  She opined that plaintiff had marked restrictions in activities of daily living, marked difficulties in maintaining social functioning, and marked episodes of deterioration or decompensation in a work or work-setting which [would] cause her to withdraw from that situation or to experience exacerbation of signs or symptoms. (Tr. 594)  The form defined "marked" as "an impairment which seriously affects ability to function independently, appropriately and effectively." (Tr. 594)

On the questionnaire related to plaintiff's depression, Dr. Zhalkovska opined that plaintiff was experiencing a disturbance of mood accompanied by full or partial depressive syndrome. (Tr. 596) Dr. Zhalkovska marked "yes" to the following characteristics accompanying plaintiff's depression: anhedonia or pervasive loss of interest in almost all activities; appetite disturbances with a change in weight; sleep disturbances; psychomotor agitation or retardation; feelings of guilt or worthlessness; difficulty in concentrating or thinking; thoughts of suicide; and hallucinations, delusions of paranoid thinking.  (Tr. 596)  Dr. Zhalkovska also opined that plaintiff suffered from manic syndrome, characterized by hyperactivity, pressure of speech,

decreased need to sleep, easy distractibility; and hallucinations, delusions or paranoid thinking. (Tr. 597) Dr. Zhalkovska marked "yes" when asked whether plaintiff suffered "from bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. (Tr. 597)

### 4. Reviewing Physician – Dr. Michael Lehv – October 2013

On October 21, 2013, state agency reviewing physician Michael Lehv, M.D., found that plaintiff was not disabled. He noted that there was no evidence that she had a hernia and her "[b]ack exam was suspect with multiple Waddell's signs." (Tr. 75) He further found that the evidence showed that she had good memory and concentration for routine tasks; could make decisions and care for her personal needs; and that her physical discomfort did not prevent her from performing any of her past relevant work. (Tr. 94)

### 5. Reviewing Psychologist – Bruce Goldsmith, Ph.D. – January 2014

On January 2, 2014, state agency reviewing psychologist, Bruce Goldsmith, reviewed plaintiff's file and found that she had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence of pace and no episodes of decompensation. (Tr. 101-102)

### D. Testimonial Evidence

### 1. Plaintiff's Testimony

Plaintiff offered the following testimony at the April 6, 2015 hearing before the ALJ:

- Her date of birth is December 5, 1961 and she was 53 years old at the time of the hearing.(Tr. 46)

- She lived with her husband in a house in Toledo, Ohio. (Tr. 46)

- Plaintiff is 5'6" and weighed 183 pounds at the time of the hearing. (Tr. 46) Plaintiff had recently lost twenty pounds. (Tr. 47)

- She has a driver's license but did not prefer to drive. (Tr. 47)

- She did not complete high school. She was kicked out in the eleventh grade when she got into trouble. (Tr. 47-48)

- She previously worked as a housekeeper for Toledo Hospital. She was required to regularly lift between 20 to 25 pounds at that job. (Tr. 48) She had also previously provided childcare services out of her home for five children ranging from three to ten years old. (Tr. 48-49) Plaintiff worked briefly at a towel folding service but quit because her arms and legs were hurting. (Tr. 49)

- She was capable of walking about a half a block. She felt that she could stand for approximately ten minutes at a time. (Tr. 50) She could sit for thirty minutes at a time. (Tr. 51) She testified that she could not lift ten pounds. (Tr. 51)

- She sleeps around 3-4 hours per night but rests comfortably for six hours with medications. (Tr. 51-52)

- Her husband assists her when she takes a shower to make sure she doesn't lose her balance and fall. Plaintiff did some of the cooking but was unable to lift pots and plates. She was able to sweep, and mop. Her husband did the rest of the household chores. Plaintiff was not able to do laundry due to the steps. (Tr. 52)

- Plaintiff formerly participated in church activities and liked to bowl and do things with her grandchildren, like basketball and baseball. However, she was no longer able to do any of those things because they were too tiring. (Tr. 53)

- When questioned by her attorney, plaintiff reported that she did not want to be around anybody due to her anxiety. She stated that she was unable to breathe, got so excited and shut down a lot. Being closed in, being in strange places, and being around a lot of people made her feel anxious. Plaintiff testified that she had panic attacks which felt like she could not breathe and was dying. (Tr. 54) Plaintiff's panic attacks lasted 15-20 minutes and occurred two to three times per week. (Tr. 55)

- She also suffered from depression. She testified that her depression caused her to have mood swings. When she felt down she wanted to stay in her bed all day. She often had crying spells lasting about twenty minutes to all day. (Tr. 56)

- She saw "ghosts" turning really fast or objects moving about three times per month. She also heard people telling her to kill herself or hurt herself about four times per month. (Tr. 57)

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Charles McBee offered the following testimony:

- He considered plaintiff's past work to include work as a cashier in a fast food environment, an environmental services worker, a housekeeping cleaner and a childcare provider. (Tr. 58-59)

- For the first hypothetical question, the VE was instructed to consider a hypothetical individual with the same age, education and past jobs as plaintiff who had the residual functional capacity to perform work at the light exertional level with postural limitations of occasional climbing of ladders, ropes, or scaffolds; frequent stooping, kneeling, crouching and crawling; frequent use of the bilateral lower extremities for operation of foot controls; manipulative limitation of occasional use of the left upper extremity for overhead reaching, handling, and fingering; work limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions, with few, if any, workplace changes; occasional interaction with the general public, coworkers, and supervisors. (Tr. 60)

- He opined that the individual would not be able to perform any of plaintiff's past work. However, she would be able to perform jobs such as photocopy machine operator with an estimated 1200-1500 jobs in Ohio and at least 100,000 nationally; cleaner with an estimated 10,000 jobs in Ohio and 500,000 nationally; and mail clerk with approximately 2,000 jobs in Ohio and 75,000 to 100,000 nationally. (Tr. 61)

- The ALJ then added that the hypothetical individual would need to have a sit/stand option provided that it would not take them off task more than 10% of the work period. With this additional limitation, the VE testified that the individual would still be able perform the job of photocopy machine operator but the numbers of jobs available would be reduced to 500 in Ohio and 20,000 to 30,000 in the national economy. The VE also felt that the individual could perform the job of hand packager with 500-1000 jobs in Ohio and approximately 20,000 in the national economy; and a bagger of garments with 300 to 500 jobs in Ohio and approximately 30,000 in the national economy. (Tr. 61-62) The VE's testimony regarding the sit-stand option was based on his own education and experience because the DOT does not address the sit/stand option. (Tr. 64)

- The ALJ then asked the VE to retain all of the limitations already specified and to indicate whether any jobs would be available if the hypothetical individual could only perform sedentary work. The VE testified that, at the sedentary level, the individual could work as a document preparer, with 5,000 jobs in Ohio and 200,000 nationally; a hand mounter, with 200 to 300 jobs in Ohio and an estimated 15,000 to 20,000 nationally; and a surveillance system monitor, with approximately 3,000 jobs in Ohio and 100,000 in the national economy. (Tr. 62-63)

- He testified that employees are generally expected to be on task at least 80% throughout the day. He also testified that missing one day or more per month, beyond normal sick and vacation time, would subject an employee to reprimand and/or

dismissal.  He believed that missing 10 days over the course of a year would typically subject an employee to termination.  (Tr. 64)

- He stated that, apart from his opinion regarding the sit-stand option, his testimony was consistent with the DOT and the SCO. (Tr. 65)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....
>
> 42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to produce evidence that establishes whether the claimant has the

RFC and vocational factors to perform work available in the national economy. *Id.*

## V.     The ALJ's Decision

The ALJ issued a decision on April 17, 2015. A summary of his findings is as follows:

1. Ms. Autman Ross met the insured status requirements of the Social Security Act through December 31, 2015. (Tr. 22)

2. Autman Ross had not engaged in substantial gainful activity since January 14, 2012, the alleged onset date. (Tr. 23)

3. Autman Ross had the following severe impairments: affective disorder; anxiety disorder; and dermatomyositis and/or collagen disease with back, shoulders and knee pain. (Tr. 22)

4. Autman Ross does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 22)

5. Autman Ross had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with the exception that she needed to be allowed to alternate between sitting and standing, provided that she not be off task for more than 10% of the work period; she was limited to occasional climbing of ladders, ropes or scaffolds; frequent stooping, kneeling, crouching and crawling; frequent use of the bilateral lower extremities for operation of foot controls; she was limited to occasional use of the left upper extremity for overhead reaching; frequent use of the bilateral upper extremities

for reaching, handling and fingering; she was limited to simple, routine and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions with few, if any work place changes; and occasional interaction with the general public, coworkers and supervisors. (Tr. 26-32)

6. Autman Ross was unable to perform any past relevant work. (Tr. 32)

7. She was born on December 5, 1961. On the alleged onset date, January 14, 2012, she was 50 years old, which is defined as an individual closely approaching advanced age. (Tr. 33)

8. Autman Ross had a limited education and was able to communicate in English. (Tr. 33)

9. Transferability of job skills was not material because plaintiff was not disabled whether or not she had transferable job skills. (Tr. 33)

10. Considering Autman Ross's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform. (Tr. 33)

Based on the foregoing, the ALJ determined that Autman Ross had not been under a disability from October 1, 2011 through April 17, 2015 (the date of the ALJ's decision.) (Tr. 35)

## VI. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether the ALJ applied the correct legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v.*

*Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### A.     ALJ's Assessment of Medical Opinions

Plaintiff argues that the ALJ did not include the mental limitations expressed in the opinions of Dr. Hammerly and Dr. Zhalkovska when he determined plaintiff's RFC.  Plaintiff further argues that the ALJ did not give good reasons for rejecting the uncontradicted opinions of these medical experts who both examined plaintiff.  The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).

### 1.     Dr. Hammerly

Plaintiff argues that the ALJ did not provide adequate reasoning for rejecting the opinion of Dr. Hammerly; that the ALJ should have considered that Dr. Hammerly is a medical specialist; and that his opinion was consistent with the opinion of Dr. Zhalkovska regarding plaintiff's mental limitations.  Plaintiff also contends that, contrary to the ALJ's finding, the opinion expressed by Dr. Hammerly was not unclear.

With regard to the evaluation of medical evidence, the Code of Federal Regulations

states:

(c)  How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  ***Unless we give a treating source's opinion controlling weight*** under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. ...

> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

> (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

. . .

20 CFR § 416.927(c).  See also 20 CFR § 404.1527(c).

Dr. Hammerly is a specialist and examined plaintiff. In considering his opinion, the ALJ stated:

> Thereafter, the claimant did attend a psychological consultative examination with Mark Hammerly, Ph.D., in October 2013. At the examination, the claimant stated that she was applying for disability due to her mental state for which she was prescribed Prozac and Ativan. However, she noted of a lack of consistency in taking the prescribed medications with her just recently back to taking the prescribed medication. Thus, Dr. Hammerly did observe that her mood was dysphoric, her affect constricted and her manner agitated, demoralized and tearful with signs of fidgeting, jittering and impaired mental control, concentration and memory. On the other hand, Dr. Hammerly also observed that the claimant was cooperative, alert and oriented to person, place, date and situation with clear speech and a coherent, goal-directed and logical thought processes. He also remarked that her reliability was in question due to her responses to the mental status examination exercises.
>
> * * *
>
> Hence, based upon the above, the undersigned has considered the opinion of Dr. Hammerly, the consultative examiner, that the claimant has an average ability to understand remember and carry out instructions but would have difficulty sustaining employment dealing with the public and respond [sic] in a less than appropriate manner with ordinary workplace pressures and changing work environments. Unfortunately, the opinion is lacking specificity, which would make it more helpful to the undersigned in determining the claimant's residual functional capacity, as "respond in a less than appropriate manner" are vague terms open to multiple subjective interpretations depending on the interpreter. The undersigned is also mindful that the doctor's opinion with regard to understanding, remembering and carrying out instructions and responding to supervision and coworkers are guestimates since the claimant's reliability was in question with regard to her psychosis and answers on the mental status examination, rendering the opinion questionable. Thus, little weight is accorded this opinion.

(Tr. 29-30) (internal citations omitted)

The ALJ then assigned great weight to the reviewing psychological consultants' mental assessments, that plaintiff "is capable of simple, repetitive tasks where there is no direct contact with the public, superficial contact with others, no strict work quotas imposed and changes are not frequent and easily explained." He assigned great weight to their assessments because "they

appear well supported by [plaintiff's] treatment records that revealed she was cooperative or pleasant, alert and oriented with clear speech, a logical thought processes and intact attention when seeking treatment." (Tr. 31)

The ALJ must articulate the reasons underlying his decision to give a medical opinion a specific amount of weight. *See, e.g*., 20 CFR § 404.1527(d); *Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Commissioner,* 378 F.3d 541, 544 (6th Cir. 2004). The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the medical opinion and the reasons for that weight. SSR 96-2p, 1996 SSR LEXIS 9.

As can be seen, the regulations provide that the ALJ is to evaluate every medical opinion in the record, and, unless giving a treating physician's opinion controlling weight, must consider all of the listed factors when deciding the weight to accord other medical opinions. 20 CFR § 416.927(d); 20 CFR § 404.1527(d). Plaintiff is correct in pointing out that the ALJ failed to note that Dr. Hammerly was a specialist.[3] Plaintiff's argument that Dr. Hammerly's opinion was not unclear is also well taken. Dr. Hammerly examined plaintiff and produced a lengthy report containing his observations and opinions. His report included observations both favoring and disfavoring a finding of disability. His opinion regarding plaintiff's functional assessment does not appear to be "lacking in specificity." When criticizing Dr. Hammerly's opinion as lacking in specificity, the ALJ pointed to a statement that plaintiff would "respond in a less than appropriate

---

[3] Defendant argues that the ALJ was only required to consider whether Dr. Hammerly was a specialist if he was a treating physician. However, the plain language of the regulations states that "*unless we give a treating source's opinion controlling weight*, we will consider the following factors:…." One of the factors to be considered is whether the medical source is a specialist. 20 C.F.R. § 416.927(c)(5) (Emphasis added). See also 20 CFR § 404.1527(c)(5). The ALJ did not assign controlling weight to the opinion of a treating physician in this case.

manner." He thought this statement was vague and open to interpretation. (Tr. 30)   However, the undersigned does not find this to be a vague statement, particularly when it is read in conjunction with other portions of Dr. Hammerly's report where he expressed that plaintiff was displaying or noting "evidence of hallucinations" and was "rather distraught and doesn't always make much sense." (Tr. 401)  Moreover, Dr. Hammerly's report provided far more specificity than did the non-examining, reviewing psychologist to whom the ALJ assigned great weight. (Tr. 101-102)

The ALJ was not required to assign controlling weight to the opinion of Dr. Hammerly in this case, or even to provide good reasons for failing to do so because Dr. Hammerly is not a treating source. *See Smith v. Comm'r,* 482 F.3d 873, 876 (6th Cir. 2007).  However, the regulations state that the ALJ must consider certain factors when assessing the weight to be given to Dr. Hammerly's opinion. 20 CFR § 416.927(c).  These factors include that "generally more weight is given to the opinion of a source who has examined you than to the opinion of a source who has not examined you;" that the ALJ will consider the supportability of the opinion; and that he or she will consider whether the opinion is from a specialist. *Id.*  The court has no way to know whether the ALJ followed the agency's regulations when he assessed the weight assigned to Dr. Hammerly's opinion.  He did not mention that Dr. Hammerly was a specialist; he did not discuss the supportability of his opinion; and he did not assign greater weight to his opinion than the reviewing psychologist.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where

that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")
The undersigned recommends that this case be remanded so that the ALJ can properly assess the
weight to be given to the opinion of Dr. Hammerly.

### 2. Dr. Zhalkovska

Plaintiff also argues that the ALJ improperly assigned little weight to the opinion of Dr.
Olga Zhalkovska. Plaintiff contends that Dr. Zhalkovska was a treating source and her opinion
was entitled to controlling weight. Plaintiff also argues that the ALJ failed to provide good
reasons for rejecting Dr. Zhalkovska's opinion.

Defendant argues that the ALJ was not required to assign controlling weight to the
opinion of Dr. Zhalkovska because she cannot be considered a treating physician. Defendant
further contends that the ALJ _did_ provide good reasons for rejecting the opinion by stating that it
was inconsistent with the objective findings in the record and inconsistent with Dr. Zhalkovska's
own treatment notes.

### a) Was Dr. Zhalkovska a "Treating Physician?"

Defendant argues that Dr. Zhalkovska was not a treating physician because she only saw
plaintiff twice for a total of 80 minutes and prepared her medical source opinions at the second
appointment.[4] "The number of times a plaintiff has been examined by her physician, prior to the
date that physician renders his or her opinion, must be considered in deciding whether the
physician has an ongoing treatment relationship, but it is not the sole determining factor under
the applicable regulations." _Jones v. Astrue,_ 2012 U.S. Dist. LEXIS 81346. Dr. Zhalkovska saw
Plaintiff twice within a thirty-day period and changed her psychiatric medications. (Tr. 544,
550). Although plaintiff only met with Dr. Zhalkovska twice, she was also attending weekly

---

[4] Defendant cites case law holding that sparse treatment does not constitute an ongoing treatment
relationship. _See Smith v. Comm'r,_ 482 F.3d 873, 876 (6th Cir. 2007).

therapy sessions at the same medical facility. (Tr. 550) "Since most psychiatrists oversee medications as opposed to providing the type of weekly or biweekly psychotherapy provided by a therapist or psychologist, a period of months between such appointments is not uncommon." *Jones,* 2012 U.S. LEXIS at * 21. A prescribing psychiatrist is presumed to intend to continue a treatment relationship to see how the prescribed drugs affect the patient. *Id.* It appears that Dr. Zhalkovska did intend to continue seeing plaintiff and was overseeing her treatment at Harbor Behavioral Health. (Tr. 551) Because the records of Dr. Zhalkovska reflect visits with "a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)," 20 C.F.R. §404.1502, she was properly considered a treating physician. See generally, *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir.1989) (holding that ALJ erred by discounting one-time psychiatric examination based upon the relative "imprecision of the psychiatric methodology or the absence of substantial documentation." (internal quotation marks and additional citation omitted)). Moreover, the ALJ concluded that Dr. Zhalkovska as a treating physician. (Tr. 25) For these reasons, defendant's argument that the ALJ was not required to consider Dr. Zhalkovska a treating physician is not well taken. If anything, the Commissioner's argument is a post-hoc attempt to substantiate the ALJ's failure to correctly handle the opinions of Dr. Zhalkovska under the treating physician rule.

### B. Treating Physician Rule

The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)(6).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ( ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> [T]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377.

The ALJ discussed Dr. Zhalkovska's opinion at Step Four, stating,

> Thus, while the undersigned has considered the opinion of the claimant's psychiatrist, Olga Zhalkovska, M.D., that the claimant's depression causes moderate restrictions in activities of daily living with marked difficulties in maintaining social functioning, extreme deficiencies of concentration, persistence or pace and extreme episodes of deterioration, it is accorded little weight. Likewise, her opinion that the claimant's anxiety causes extreme deficiencies in concentration, persistence or pace with marked restrictions and/or difficulties in the other three areas is accorded little weight as well.  Little weight is accorded to her opinions because is [sic] not consistent with the clinical findings in the record, including her own treatment records.

> Indeed, mental status examinations by Dr. Zhalkovska consistently provided the claimant was cooperative or pleasant, alert and oriented with intact attention and memory.  The claimant's other treating physicians have also routinely provided that she was cooperative, alert and oriented.  Moreover, as chronicled in the claimant's treatment record and per her reports, the claimant has described a somewhat normal level of daily activity and interaction at least at times, which are not limited to the extent contemplated in the doctor's opinions.  Thus, little weight is accorded to her opinions.

As noted above, the ALJ was not required to explain how he considered each factor but was required to state his "good reasons" specifically to make clear to any subsequent reviewers

"the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." 20 C.F.R. § 416.927(c)(2); see also *Cole,* 661 F.3d at 938.  The only reason provided by the ALJ for rejecting Dr. Zhalkovska's opinion was that it was not consistent with the clinical findings in the record.  The ALJ attached particular significance to notes in the records describing plaintiff as "cooperative or pleasant, alert and oriented with intact attention and memory."  However, these notes describing plaintiff's status and demeanor at her appointment do not necessarily contradict Dr. Zhalkovska's opinion that plaintiff had marked and extreme functional impairments.  Indeed, by attaching such great significance to the plaintiff's alertness, orientation, and cooperativeness – facts known to Dr. Zhalkovska, Dr. Hammerly and other physicians – the ALJ essentially turned himself into a medical expert, concluding that one cannot have the serious mental problems identified by Dr. Zhalkovska if one is responsive to her environment, knows who she is or knows where she is.[5]  Such personal medical views cannot provide a basis for disregarding the opinions of a treating source; quite obviously, such conclusions did not prevent Dr. Zhalkovska from making her diagnosis.

Further, the ALJ did not describe any of the other factors in his consideration of Dr. Zhalkovska's opinion.  His decision did not make clear to subsequent reviewers, including this court, the reasons for assigning little weight to Dr. Zhalkovska's opinion.  And, his rejection of her opinion is particularly troubling here, because her opinion expresses many of the same limitations opined by the examining psychiatrist, Dr. Hammerly.

---

[5] An online medical dictionary defines "alert and oriented" as follows: "Clinical shorthand for the findings in a physical examination of the patient by a healthcare worker, referring to a patient who is responsive to his or her environment (alert), and knows who he or she is, where he or she is, and the approximate time." http://medical-dictionary.thefreedictionary.com/alert+and+oriented+x+3 (last visited May 11, 2017)

There may, in fact, have been good reasons to reject the opinion of Dr. Zhalkovska. There are few medical records evidencing an ongoing relationship between plaintiff and this doctor. Also, the medical source statements completed by Dr. Zhalkovska were "check-box" opinions. See *Ellars v. Comm'r of Soc. Sec*., 647 F. App'x 563, 566 (6th Cir. 2016); *Price v. Comm'r* of Soc. Sec., 342 F. App'x 172, 176 (6th Cir. 2009). However, the ALJ's decision is lacking in any specificity as to the "good reasons" for rejecting her opinion. He did not sufficiently support his decision to reject Dr. Zhalkovska's opinion with evidence in the case record or make clear the reasons for rejecting her opinion. The ALJ's conclusory statement that Dr. Zhalkovska's opinions were inconsistent with her own treatment notes, without identifying in what way(s) he found inconsistency, will not suffice.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be considered "harmless error." This occurs when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 547 (6th Cir. 2004). See also *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011). In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. See *Nelson v. Comm'r of Soc. Sec*., 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.,* 375 Fed. Appx. 543, 551 (6th

Cir. 2010). "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 Fed. Appx. at 551.

Here, the ALJ assigned little weight to the opinions of the treating and consulting mental health experts, both of whom opined that plaintiff had marked and/or extreme functional limitations. Conversely, he assigned great weight to the non-examining psychiatrist who only reviewed plaintiff's file. The court cannot say that his treatment of the medical opinions in this case was merely harmless error. Although there may have been good reasons to reject the opinions of Drs. Hammerly and Zhalkovska, the ALJ failed to articulate those reasons with sufficient specificity to allow for meaningful review.

### C.    Inconsistency between VE's Testimony and the DOT

Finally, plaintiff argues that the ALJ erred in relying on VE testimony that was inconsistent with the physical requirements of jobs found in the Dictionary of Occupational Titles (DOT.)[6] Plaintiff argues that there was an inconsistency between the ALJ's RFC limiting plaintiff to occasional use of the left upper extremity for overhead reaching and the three jobs named by the VE – photocopy machine operator, hand packager, and garment bagger – which all require frequent reaching.[7] Plaintiff argues that the case must be remanded to address this inconsistency.

As pointed out by defendant, the Sixth Circuit has held that if the ALJ asks the VE if his or her testimony is consistent with the DOT and the VE testifies that it is, the ALJ has satisfied

---

[6] ECF Doc. 13, Page ID# 687
[7] Defendant also contends that plaintiff has confused the reaching requirements stated in the DOT. Defendant argues that these positions require frequent reaching not frequent "overhead" reaching.

his burden. *Lee v. Comm'r*, 529 Fed. App'x. 706, 715, (6th Cir. 2013).[8] Here, the ALJ asked the

VE if his testimony was consistent with the DOT and, with the exception of the sit/stand option

(not relevant here) it was. (Tr. 65) Thus, the ALJ satisfied his burden and was permitted to rely

on the testimony provided by the VE. *Lee,* 529 Fed. App'x at 715. The undersigned would not

recommend reversal on this basis.

## VII. Recommendation

The court should find the decision of the Commissioner was not supported by substantial

evidence. I recommend that the final decision of the Commissioner be VACATED and that the

case be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings

consistent with this Report and Recommendation.


Dated: May 11, 2017

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**

---

[8] Defendant also submitted supplemental case law supporting its argument that the VE's testimony was not inconsistent with the DOT. See *Gutierrez v. Colvin,* 2016 WL 6958646 (9th Cir. 2016); ECF Doc. 17, Page ID# 718.